Plaintiffs-appellants, Jeffrey Snider ("Snider") and his wife, Darla Snider, appeal a decision of the Clermont County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Clermont Central Soccer Association ("CCSA").
On November 13, 1993, CCSA sponsored a tournament for soccer teams belonging to the association. All the games scheduled that day were championship games. The tournament was held at fields operated by Batavia High School. The player representative of Batavia, the host club, was Kathy Aldred.[1] In his deposition, Snider testified that Aldred, as the Batavia player representative, was in charge of the fields and the championship play among the various teams.
Snider was trained as a referee by CCSA, was paid $8 per game by CCSA, and had been hired by CCSA to referee three games at the tournament. When the tournament started that morning, the fields were wet. As the tournament progressed, it rained on and off throughout the day, making the fields wetter and resulting in standing water on parts of the fields.
In addition to being a referee that day, Snider was also the assistant coach for his daughter's team. Snider's daughter's game was one of the first scheduled that day. In an affidavit filed on May 15, 1998, Snider stated that because the fields were already wet and sloppy, Dave Daley, the head coach for Snider's daughter's team, "himself and at the request of the parents, approached Kathy Allred * * * to see if the game could be changed to a different date. After speaking with Kathy Allred, Dave Daley told [Snider] that the games [had] to go on that day no matter what." Snider testified that his daughter's game was eventually moved to a different field which, by the end of the game, had standing water and was not suitable for play.
Snider refereed his first game without incident. Snider testified that while the field was at first suitable for play, it eventually became dangerous due to standing water. With regard to the second game, Snider testified that as the game progressed, he felt the field was becoming unsafe for himself and the players. By half-time, the field had standing water. Snider testified that at clinics (or schools) put on by CCSA for referees, referees were always told that they should not play if there was standing water. However, based on Aldred's statements that the games had to go on no matter what, Snider believed he could not cancel the second game. Snider was seriously injured during that game when he attempted to jump out of the way of some players, slipped, flipped, and struck his head on the ground.
Appellants filed a complaint in the trial court on January 27, 1995, alleging that CCSA's negligence in determining that the fields were playable and in allowing the games to proceed caused Snider's injuries. CCSA filed a motion for summary judgment on March 24, 1998. By decision filed June 18, 1998,[2] the trial court granted summary judgment in favor of CCSA on the ground that Snider had primarily and voluntarily assumed the risks inherent in refereeing a soccer game. This appeal follows.
In their sole assignment of error, appellants argue that the trial court erred in granting summary judgment in favor of CCSA. Specifically, appellants argue that in light of Aldred's comment that the games had to go on no matter what, Snider's "participation in the game" was not voluntary and thus did not constitute primary assumption of risk. Appellants also argue that although Snider was an independent contractor and not an employee of CCSA, the Supreme Court of Ohio's holding inCremeans v. Willmar Henderson Mfg. Co. (1991), 57 Ohio St.3d 145, nevertheless applies in the case at bar. In Cremeans, the court held that "[a]n employee does not voluntarily or unreasonably assume the risk of injury which occurs in the course of his or her employment when that risk must be encountered in the normal performance of his or her required job duties or responsibilities." Id. at syllabus.
Civ.R. 56(C) provides in part that summary judgment shall be rendered where there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is made, who is entitled to have evidence construed most strongly in his favor. A genuine issue of material fact exists when the relevant factual allegations in the pleadings, affidavits, depositions, or interrogatories are in conflict.Duke v. Sanymetal Prod. Co., Inc. (1972), 31 Ohio App.2d 78,81.
"Assumption of the risk requires three elements: one must have full knowledge of a condition; such condition must be patently dangerous to him; and he must voluntarily expose himself to the hazard created." Briere v. Lathrop Co. (1970),22 Ohio St.2d 166, 174-175. After Ohio adopted comparative negligence, see R.C. 2315.19, the Supreme Court of Ohio merged implied assumption of risk with contributory negligence.Anderson v. Ceccardi (1983), 6 Ohio St.3d 110, 113. The court, however, specifically excluded from the merger express assumption of risk and primary assumption of risk. Id. at 114. Both express and primary assumption of risk thus remain as complete bars to recovery. Siglow v. Smart (1987), 43 Ohio App.3d 55,57. Primary assumption of risk "concerns cases where there is a lack of duty owed by the defendant to the plaintiff[,]" Anderson at 114, such as in baseball cases where a plaintiff is injured when a baseball is hit into the stands, and applies when "the activity undertaken involves such obvious and unavoidable risks that no duty of care is said to attach."Carey v. AK Steel Corp. (July 13, 1998), Butler App. No. CA98-02-022, unreported, at 3.
Appellants insist that primary assumption of risk cannot apply because Snider's "participation in the game" as referee was not voluntary but rather compelled by Aldred's statement. Snider consistently testified that based on that sole statement, he did not believe he could call off any game despite the obvious dangerous condition of the fields.
The regulations governing CCSA are included in CCSA's Coach Handbooks. CCSA's 1993 Coach Handbook specifically provides in relevant part:
II. GAME RULES
* * *
D. INCLEMENT WEATHER
* * *
 3. A referee may refuse to start a game, or may stop it once play has started if in 15 minutes or the referee's judgement, the condition of the ground is such as to endanger the players. In the event of an electrical storm, play must be stopped until the danger has passed, [sic] If a game is stopped after at least one half has been played, and cannot be restarted because of weather conditions, it shall be considered an official game. If less than one half of the game has been played, it must be rescheduled in its entirety. (Emphasis added.)
Snider testified that while he never received a copy of CCSA's Coach Handbook, the regulations were discussed at clinics sponsored by CCSA. Snider also testified that he started refereeing in 1991 or 1992 and that he went through the clinic every year. Snider admitted that under the foregoing rule, a referee would have the responsibility and the authority to call off a game if the field was in bad shape. Snider testified however that the rule did not apply on November 13, 1993, because tournament officials were responsible for calling off the games due to inclement weather. Snider was unable to point to any written rule supporting his assertion.
The Federation Internationale de Football Association ("FIFA") promulgates rules governing soccer play. The FIFA rules, which CCSA has adopted in its Coach Handbook,[3]
specifically provide in relevant part:
LAW V
Referees
 A referee shall be appointed to officiate in each game. His authority and the exercise of the powers granted to him by the Laws of the Game commence as soon as he enters the field of play.
 His power of penalizing shall extend to offenses committed when play has been temporarily suspended, or when the ball is out of play. His decision on points of fact connected with the play shall be final, so far as the result of the game is concerned. He shall:
* * *
 (d) have discretionary power to stop the game for any infringement of the Laws and to suspend or terminate the game whenever, by reason of the elements, interference by spectators, or other cause, he deems such stoppage necessary. In such a case he shall submit a detailed report to the competent authority, within the stipulated time, and in accordance with the provisions set up by the National Association under whose jurisdiction the match was played. Reports will be deemed to be made when received in the ordinary course of post. (Emphasis added.)
Snider testified that the FIFA rules instructed him on how to perform his duties as a referee. With regard to the foregoing FIFA rules, Snider again admitted that under the rule, a referee could call off the game because of bad weather. However, he reiterated that while he would have had the authority to call off the game during the regular season, he did not have such authority on November 13, 1993 because it was a tournament game.
Contrary to Snider's assertion, neither set of rules distinguishes between regular season and tournament with regard to a referee's authority to call off a game because of inclement weather. Rather, both sets of rules clearly and unequivocally give a referee discretionary power to stop a gamewhenever the referee deems such stoppage necessary. As previously noted, during clinics sponsored by CCSA, referees were always told that they should not play if there was standing water on the fields. It is undisputed that at least by half time during the second game, there was standing water. Thus, Snider, who had been refereeing since 1991 or 1992 at the rate of three or four games per weekend, and who was aware of a referee's authority to call off a game because of inclement weather under both sets of rules, could have refused to start or continue the game. By continuing to referee, Snider voluntarily placed himself in the area where the game was played and as a result, assumed the ordinary risks of the game, including the possibility of being injured.
We do not believe that Aldred's statement rendered Snider's participation as a referee involuntary. The record clearly shows that the comment was made after a coach asked to call off a game. However, unlike referees, coaches have no responsibility or authority to call off games under either set of rules. Snider himself testified to that effect. In addition, Snider was never personally told he could not call off the game. Nor did he ask to call off the game even though he was clearly aware of the presence of standing water on the field and the danger of that condition.
Appellants argue, however, that assumption of the risk cannot apply because under Cremeans v. Willmar Henderson Mfg. Co.
(1991), 57 Ohio St.3d 145, Snider's work-related injury was not voluntarily assumed in light of Aldred's statement. Cremeans
involved a manufacturer's use of the defense of assumption of the risk in a strict liability suit brought by an employee injured during the performance of his required job duties. Appellants contend that although Snider was an independent contractor and not CCSA's employee, Cremeans nevertheless applies to the case at bar. It is appellants' contention that the distinction between an employee and an independent contractor under Cremeans is "a distinction without a difference."
Appellants are in essence asking this court to interpretCremeans expansively so as to apply it to a work-related injured independent contractor case. This we decline to do. The holding in Cremeans clearly applies to an employee whose "decision to encounter the risk was not voluntary due to the economic reality of today's work place." Syler v. Signode Corp.
(1992), 76 Ohio App.3d 250, 254. Unlike an employee, an independent contractor has the right to choose the method in which the work will be performed. As such, CCSA could not control the manner in which Snider performed his job as a referee, i.e., CCSA could not "force" Snider to perform dangerous work. In addition, "[a]s the economic necessity of undertaking risky tasks imposed upon employees is not similarly imposed upon independent contractors, we find the Cremeans
proscriptions against the use of these defenses inapposite to the case sub judice." Maher v. Scollard (Jan. 29, 1993), Hamilton App. Nos. C-910687 and C-910720, unreported, at 2. The evidence showed that while CCSA paid Snider $8 per game, Snider's livelihood did not come from refereeing games but from working full time in a plant in Norwood, Ohio.
In light of the foregoing, we therefore find that the doctrine of primary assumption of risk applies in this case and bars recovery. As a result, summary judgment in favor of CCSA was proper. Appellants' sole assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and KOEHLER, J., concur.
[1] This person has also been referred to as Kathy Aldridge and Kathy Allred in the record.
[2] The trial court's judgment entry was filed on August 13, 1998.
[3] CCSA's 1993 Coach Handbook provides that "[t]he basic rules for play in the Clermont Central Soccer Association are covered under FIFA playing rules * * *."